IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

───────────────────────────

MATTIEU BURKS,

               Plaintiff,         Civil Action No.
                                 9:16-CV-0759 (FJS/DEP)

    v.

CHAD STICKNEY, *et al.*,

               Defendants.

───────────────────────────

APPEARANCES:               OF COUNSEL:

FOR PLAINTIFF:

STOLL, GLICKMAN & BELLINA LLP    LEO GLICKMAN, ESQ.
475 Atlantic Avenue, Third Floor
Brooklyn, New York 11217

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN     DENISE P. BUCKLEY, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## DECISION AND ORDER

     This is an action brought by plaintiff Mattieu Burks pursuant to 42 U.S.C.

§ 1983 against a number of individuals employed by the New York State

Department of Corrections and Community Supervision ("DOCCS") alleging

that they subjected him to cruel and unusual punishment while confined in a New York State prison facility. During the course of discovery, plaintiff's counsel was provided with an investigative file created by the DOCCS Office of Special Investigations ("OSI") regarding the incident giving rise to plaintiff's claims. The case file was disclosed to plaintiff's counsel pursuant to a protective order issued by the court, on stipulation of the parties. Under that order, while plaintiff's counsel is authorized to permit plaintiff to review the materials disclosed, they are otherwise restricted to his counsel on an attorney's-eyes-only basis.

Currently pending before the court is plaintiff's request for declassification of portions of the OSI file under the governing protective order and, correspondingly, for authorization to publicly disseminate those documents. For the reasons set forth below, the request is granted in part.

I.     BACKGROUND

Plaintiff commenced this action on June 27, 2016. Dkt. No. 1. In his complaint, plaintiff alleges that, at the relevant times, he was confined in the Clinton Correctional Facility ("Clinton"), a prison operated by the DOCCS. *See generally id.* Generally, plaintiff claims that while at Clinton he was harassed, assaulted, and deprived of certain basic necessities, including water and electricity. *Id.* Plaintiff's complaint asserts Eighth

Amendment cruel and unusual punishment claims against several named corrections officers, as well as additional, unidentified Doe defendants. *Id.*

During the course of discovery, plaintiff requested the production of a case file created by the OSI in connection with an investigation into plaintiff's allegation that he was assaulted by corrections officers at Clinton on July 5, 2015. To facilitate the production of that file by defendants' counsel, the parties entered into a stipulation providing for the entry of a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. Dkt. No. 30. The protective order is limited in scope and specific to the OSI case file, and acknowledges the parties' recognition of the confidential and sensitive nature of that file and the security concerns and other deleterious effects that could result from public disclosure of its contents. *See generally id.* Paragraph eleven of the protective order provides that, in the event the parties dispute "the application of the terms of [the order] to any part of the Protected Records," they "reserve the right to seek an order from the Court regarding the part of the Protected Records in dispute." Dkt. No. 30 at 6. Following the entry of the stipulated order, the OSI case file was produced to plaintiff's counsel on or about January 15, 2017, redacted to remove social security numbers and

personal addresses and designated as CONFIDENTIAL ATTORNEY VIEWING ONLY. *See, e.g.,* Dkt. No. 33-1.

Upon receipt of the OSI file, plaintiff's counsel sent a letter to defendants' attorney on January 19, 2017, objecting to the confidentiality designation with regard to certain portions of the OSI file. Dkt. No. 32-3. Assistant New York State Attorney General Denise P. Buckley responded by letter dated February 9, 2017, stating that her office was "instructed by the OSI that they will agree to vary the terms of the So-Ordered Stipulation and Confidentiality Order" in part, and enclosing fifty-one pages of records from the OSI file from which the confidential designation was removed, subject to minor redaction. Dkt. No. 32-4.

On March 9, 2017, pursuant to paragraph eleven of the protective order, plaintiff filed a motion with the court seeking an order releasing certain of the remaining contents of the OSI file from protection under the order. Dkt. No. 32. Plaintiff's motion implicates the following documents:

| Bates Stamp Number | Description |
|---|---|
| 6-10 | Final OSI report |
| 42-44, 112-114 | Inmate witness statements |
| 77-106 | Transcript of question and answer proceedings, held on 10/14/15, involving defendant John Mark Cross |
| 116-117 | Plaintiff's statement to OSI |

Dkt. No. 33 at 12-14. Defendants oppose plaintiff's motion. Dkt. No. 34.

Oral argument was held concerning the motion on March 31, 2017, during

a telephone conference conducted on the record, at which time decision

regarding the motion was reserved.

II.   DISCUSSION

   A.   Conflict of Interest

In his motion, plaintiff argues that a conflict of interest exists by virtue of

the fact that the New York State Attorney General represents both the

defendants in this matter and the OSI. I disagree. The OSI is an organization

within the DOCCS, the state agency for whom the named defendants work.

The New York State Attorney General routinely represents those employed by

the DOCCS who are implicated in litigation. I have been provided no reason to

believe that the interests of defendants and OSI are in conflict, nor is there

any basis to conclude that the dual role at issue will adversely affect the

Attorney General's defense of the OSI or representation of the defendants.

Accordingly, I find no basis to conclude that a conflict of interest exists as

argued by plaintiff.

I note, in passing, that in accordance with the custom in this court, the

New York State Attorney General was asked to produce the OSI file in order

to obviate the need to obtain that file through the issuance of a non-party Rule

45 subpoena to the DOCCS. Because this procedure was followed as a matter of convenience to plaintiff, he should not now be heard to argue that, despite this accommodation, defendants' counsel may not advocate for confidentiality on behalf of the OSI.[1]

B.  Merits

Important to the analysis of plaintiff's motion is consideration of the procedural posture of the case. The parties are engaged in pretrial discovery, and no dispositive motions are currently pending in the action. At issue, then, are documents produced by defendants to plaintiff subject to a negotiated Rule 26(c) protective order, and whether those documents should be released from their confidential designation and made available to the public.[2]

Discovery in a civil action is a private process through which parties exchange documents that are not filed with the court, at least during the

---

[1]    At least one court has concluded that documents held by the DOCCS are effectively within the custody or control of individual DOCCS employees named as defendants in a lawsuit based upon the practical ability on the part of the New York State Attorney General, defendants' counsel, to obtain the documents. *See Gross v. Lunduski*, 304 F.R.D. 136, 142-43 (W.D.N.Y. 2014) ("Here, the record establishes Defendant, through his attorney, an Assistant N.Y. Attorney General, provided by the local office of the New York Attorney General, has the practical ability to acquire from DOCCS many of the documents requested by Plaintiff.").

[2]    During the hearing in this matter, plaintiff conceded that his intention, should his motion be granted, is to make the OSI documents "as public as possible."

discovery phase of an action.[3] Accordingly, the public does not enjoy a presumptive right of access to discovery materials. *Schiller v. City of N.Y.*, No. 04-CV-7922, 2007 WL 136149, at *2 n.2 (S.D.N.Y. Jan. 19, 2007); *In re: Terrorists Attacks on September 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (citing *United States v. Amodeo*, 71 F. 3d 1044, 1050 (2d Cir. 1995)). The public's right of access to discovery materials is triggered only when they become judicial documents filed with the court and assume relevance to the performance of the judicial function and usefulness in the judicial process. *See Amodeo*, 71 F.3d at 1050 ("Documents that play no role in the performance of Article III functions, such as those passed between the parties in discovery, lie entirely beyond the . . . reach [of the public's presumptive right of access].")); *accord, In re: Terrorist Attacks on September 11, 2001*, 454 F. Supp. 2d at 222. The public's right of access thus plays no role in analysis of plaintiff's motion.[4]

---

[3]     Prior to 2000, Rule 5(d) of the Federal Rules of Civil Procedure mandated that all discovery materials be filed with the court absent a court order excusing the requirement. *In re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139, 146 (2d Cir. 1987). That requirement, however, has since been eliminated from the rules.

[4]     Some courts have cited *In re Agent Orange Prod. Liab. Litig.* for the proposition that the public has a right of access to materials exchanged in discovery. *See, e.g., Cooks v. Town of Southampton*, No. 13-CV-3460, 2015 WL 1476672, at *5 (E.D.N.Y. Mar. 31, 2015). *In re Agent Orange Prod. Liab. Litig.*, however, is readily distinguishable because it was decided under the prior version of Rule 5(d) of the Federal Rules of Civil Procedure, which required the filing of discovery materials.

The standard to be applied in evaluating plaintiff's motion depends upon whether it seeks a modification of the Rule 26(c) stipulated protective order, or, instead, by bringing the motion, plaintiff has invoked the right reserved under paragraph eleven of the order to challenge defendants' designation of certain portions of OSI file as confidential.[5]

In this case, the parties appear to agree that plaintiff is exercising a right that is specifically reserved under paragraph eleven of the protective order, permitting him to challenge a designation of "confidential."[6] As such, the court

---

[5]    If the application is properly regarded as seeking a modification, it is subject to a stringent standard. The Second Circuit has recognized the presumptive unfairness of modifying protective orders that have been entered into to ensure "confidentiality and upon which parties have reasonably relied" in producing sensitive materials. *AT & T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir. 2005) (citing *S.E.C. v. TheStreet.com*, 273 F.3d 222, 230 (2d Cir. 2001)). Accordingly, "[o]nce a court enters a protective order and the parties rely on that order, it cannot be modified 'absent a showing of improvidence in the grant' of the order or 'some extraordinary circumstance or a compelling need.'" *AT & T Corp.*, 407 F.3d at 562 (quoting *Martindell v. Int'l. Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979)); *accord, Allen v. City of N.Y.*, 420 F. Supp. 2d 295, 300 (S.D.N.Y. 2006).

[6]    As discussed above, that paragraph provides as follows:

> If a dispute arises as to the application of the terms of this Stipulation and Confidentiality Order to any part of the Protected Records and cannot be resolved by agreement, the parties, in accordance with the applicable Federal and Local Rules of Civil Procedure, reserve the right to seek an order from the Court regarding the part of the Protected Records in dispute. The terms of this Stipulation and Confidentiality Order shall remain in effect pending resolution of the dispute.

Dkt. No. 30 at 6. No standard is set forth for adjudicating such a challenge.

must examine the matter *de novo*, and the inquiry turns to whether the designating party has shown good cause to support the designation.[7] *Schiller*, 2007 WL 136149, at *4. In making that analysis, I must apply the standard applicable to requests for protective orders under Rule 26(c) of the Federal Rules of Civil Procedure. *Id.*

Rule 26(c) authorizes the issuance of protective orders "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" Fed. R. Civ. P. 26(c)(1). Before a protective order is issued, Rule 26(c)(1) requires a showing of "good cause." *Id.*; *see also Schiller*, 2007 WL 136149, at *2. Good cause exists when the party seeking protection demonstrates that "disclosure will result in a clearly defined, specific and serious injury. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test. Moreover the harm must be significant not a mere trifle." *Schiller,* 2007 WL 136149, at *5 (citations and quotation marks omitted).

In this case, defendants contest disclosure of the materials at issue in light of alleged "legitimate security concerns[.]" Dkt. No. 34 at 3. More specifically, defendants argue that removing the confidentiality designation of

---

[7]     The court is somewhat troubled by the circularity of the protective order, with plaintiff at one point acknowledging the confidential nature of the OSI file and the harm that could come from disclosure of its contents, and yet reserving the right to argue that there is no good cause for shielding them from public disclosure. Dkt. No. 30.

the documents "jeopardizes the safety of . . . third parties who were interviewed on a confidential basis, [and] also reveals how OSI conducts witness interviews and how information is assessed by investigators for credibility and potential motives." *Id.* at 6; *see also id.* at 7 ("Release of the Protected Records also raises concerns about revealing to the prison population information about the OSI's investigative methods, tactics, strategic policies, and procedures."). Indeed, by entering into the stipulated protective order, plaintiff seemingly acknowledged that the OSI file contents "include the names of witnesses and other information that could impair future investigations, implicate security concerns, and are protected from disclosure by law enforcement privilege." Dkt. No. 30 at 1. The protective order further acknowledges that "the OSI is concerned that its ability to conduct future investigations will be compromised if sufficient measures are not taken to protect the confidentiality of witnesses." *Id.* at 3.

"Federal courts are sensitive to . . . valid prison security issues related to discovery in prisoner civil rights cases[.]" *Gross*, 304 F.R.D. at 156. In opposing plaintiff's motion, however, defendants have only articulated broad, overarching concerns that accompany the disclosure of virtually every report and document generated during a prison investigation, and have not focused upon the particular documents at issue and any specific harms that may be

caused by their release. Similarly, the protective order itself, although stipulated to by both plaintiff and defendants, echoes only the same types of vague concerns set forth in defendants' opposition to plaintiff's motion without addressing the specific contents of the OSI file.

A careful review of the disputed documents reveals that, with limited exception, they do not reveal information that will jeopardize the safety and security of any individual or at any prison operated by the DOCCS. Though defendants contend that the OSI file contents at issue disclose investigatory methodologies that risk the efficacy and security of future DOCCS and OSI investigations, this assertion is not borne out by the court's review of the disputed materials. The OSI final investigative report does not reveal any information regarding the underlying investigations completed by Clinton staff that is not already public knowledge or disclosed in documents not covered by the protective order. For example, the OSI final report discusses the investigation undertaken by defendant Cross into plaintiff's allegation that he was assaulted. The information generated during defendant Cross' investigation was compiled in a memorandum to his supervisor that he authored, which defendants voluntarily agreed to release from the protections of the protective order. Similarly, while the OSI final report discusses the investigation that Sergeant Peck undertook with respect to plaintiff's

allegations, his investigation was also memorialized in a memorandum that defendants have agreed to make public.

Although certain of the documents at issue disclose the identities of some of the non-party individuals interviewed during the investigations, those names and/or department identification numbers can, and must, be redacted to protect the individuals' identities.[8] In addition, while defense counsel argued at the motion hearing that the contents of the witnesses' statements could reveal the identities of the inmates interviewed, the witnesses generally stated that they did not know what happened in connection with plaintiff's underlying allegation of assault or that they did not know plaintiff. Such information does not jeopardize the safety of the inmates interviewed or risk the utility of any future investigation. Moreover, I disagree with defense counsel that the witnesses' handwriting renders the authors identifiable. The three statements that actually include the witnesses' handwriting – which were taken in connection with a disciplinary hearing – include no more than eight words; the other three statements given by the same inmates were memorialized by the OSI investigator, not the witnesses.

---

[8] Accompanying service of this decision and order upon the parties is a copy of the documents at issue (Bates Stamp Nos. 6-10, 42-44, 77-106, 112-14, 116-17) with the redactions necessary to preserve the identities of the witnesses indicated.

In sum, I do not find that defendants have carried their burden of demonstrating good cause for restricting the documents at issue from public disclosure. In light of the well settled concern for general safety and security at DOCCS prison facilities, however, I will direct that plaintiff, who is a New York State prison inmate, may not obtain and/or possess a personal copy of the documents at issue. Instead, he may view the documents only while in the presence of his attorneys. Moreover, as was previously indicated, the court has approved redaction of the personal information of any inmate witnesses interviewed and contained in the documents to protect their identity.

III.    SUMMARY AND CONCLUSION

While I remain sensitive to the safety and security considerations present at DOCCS facilities, as well as the concerns involving disclosure of investigatory materials and reports generated in connection with incidents occurring within DOCCS facilities, the stipulated protective order in this matter specifically reserved the right to challenge the confidentiality designation by motion to the court. At oral argument, the parties were in agreement that paragraph eleven of the protective order was properly invoked by plaintiff in this instance, and that plaintiff was not seeking a modification of the order. Accordingly, the burden falls upon on defendants to demonstrate good cause for maintaining the confidentiality of the

documents at issue. Because defendants have identified only broad security concerns and have failed to articulate any specific injury that may result from the public disclosure of the particular documents at issue, and thus have not established good cause for retaining the protected status of the documents in issue, it is hereby

ORDERED that plaintiff's motion for relief from the restrictions imposed by the protective order in this case with regard to the portions of the OSI file now contested (Dkt. Nos. 32, 33) is GRANTED, except that plaintiff is not permitted to possess a personal copy of the OSI, and the documents at issue must be redacted as indicated herein; and it is further

ORDERED that the clerk of court serve a copy of this order, as well as a copy of the challenged documents containing the court's redactions, on the parties in accordance with the local rules of practice for this court.

Dated:    April 19, 2017
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

| **Corrections and Community Supervision**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

## Office of Special Investigations

### Final Investigative Report

## I. Background

**OSI Case #:**   IAD/15/1183       **Incident Date:**   07/05/15

**Facility/ Parole Office:**   Clinton Correctional Facility (CF)

**Complaint Source:**   Julia Royal, mother of inmate Mattieu Burks 14A5477

**Initial Allegation:** Julia Royal, who identified herself as the mother of inmate Mattieu Burks 14A5477 reported receiving a letter from her son in which he told her that he was placed in IPC on 07/07/15 because the facility is attempting to cover up an assault. Burks, in his letter, said that he was assaulted by staff but they are saying that he was assaulted by another inmate.

**Additional Allegation:**   None

## II. Summary of Investigative Findings

There is insufficient evidence to substantiate the allegations made by inmate Burks. During his interview, on 08/07/15, Burks identified one of the officers present when he was assaulted, as Officer Nolan. Yet, when interviewed again, by Investigator (Inv.) Christopher Tirado on 03/16/16, for the purpose of reviewing photo arrays Burks stated that he did not know either of the officers who had entered his cell and said that neither was depicted in the photo arrays. In fact, both Officer Nolans' who were on duty at the time of the alleged assault were in the photo arrays, as were other officers who were on duty in that area. The investigation, conducted by the facility, both of the Grievance and of the complaint, which is the predication of this investigation, were of such poor quality that it gives the appearance of a cover up. It is important to note that the only Grievance filed by Burks, relative to an assault was dated 07/02/15, a full three days before the alleged incident.

## III. Summary of Investigation

On 07/28/15, the Office of Special Investigations (OSI) received a telephonic complaint from Julia Royal, who identified herself as the mother of inmate Mathieu Burks 14A5477, reported receiving a letter from her son in which he told her that he was placed in IPC on 07/07/15, because the facility is attempting to cover up an assault. Burks, in his letter, said that he was assaulted by staff but they are saying that he was assaulted by another inmate. Royal was unable to provide any further information regarding the incident, (see items 1-2).

Inmate Burks was interviewed by the writer on 08/07/15. Burks said that he has been at Clinton CF since February 2015. On 07/05/15, he was housed in C-4-4. Burks was leaving the block for the evening meal and did not have his ID card so he was sent back to his cell. Later that evening two officers came to his cell. One was Officer Nolan and Burks did not know the name of the second officer but stated that he was young. The cell was opened and Nolan came in and grabbed Burks. The other officer reached around and punched Burks in the face. Nolan told the other officer not to punch Burks in the head, only the body. The officer pushed him into the wall and then they backed out of the cell and closed it. Burks said that he put in for medical the next day but it was a weekend so he told the nurse making rounds that he was assaulted. Later an officer came down and told Burks to leave things alone or it would get worse. Burks was seen by medical on 07/07/15 and told medical staff that he had been assaulted by officers. The nurse

CONFIDENTIAL. 1

ATTORNEY VIEWING ONLY

called a sergeant and Sgt. Cross came and told Burks to leave it alone but the nurse said that it had to be documented. Burks was photographed while at medical and got a ticket for fighting. The ticket was later thrown out. Burks said that his injuries consisted of swelling on the left side of his face and red marks on his back. Burks also said that he was dizzy from his head hitting the wall when he was pushed. Burks stated that he filed a Grievance, (see items 99-100).

Burks was interviewed again on 03/16/16, by Inv. Christopher Tirado. The purpose of the interview was to show Burks five photo arrays containing photos of the officers on duty in C-Block at the time of the alleged incident, as well as other officers on duty in the area who might have had reason to be in C-Block by virtue of their assignments. Inmate Burks was given 5 photo array cards, numbered 1 thru 5, each consisting of 6 black and white photos numbered 1 thru 6. Inmate Burks was instructed to review each of the 5 photo arrays and identify any persons involved in his alleged assault. He was instructed to take as much time as he needed, but not look to the presenter for any information or guidance in identifying any person or persons. Inmate Burks, after reviewing the photo arrays, stated the following; "I did not know the two officers who came in my cell at Clinton CF. Although I did see them when they entered my cell, they are not officers I has regular contact with. I reviewed all the photo cards and the pictures on them. The two officers who entered my cell at Clinton CF and assaulted me were not present in the photos." (see items 98 and 104, respectively).

A review of Inmate Grievance Program (IGP) files found one Grievance relative to an assault. Although the Grievance is dated as being filed on 07/16/15, the Inmate Grievance Complaint, filled out and signed by Burks, is dated 07/02/15, three days before the alleged assault. In that Grievance Burks alleges that harassment started shortly after he was interviewed regarding the escape from Clinton in June 2015, which Burks writes progressed to physical threats and two assaults. He provides no specifics for any of these incidents. The investigation was conducted by Sgt. Merit Peck. His memorandum, reporting that investigation, makes no sense. He references the alleged assault reported by Burks, which is in fact the focus of this investigation, he does not however appear to address anything contained in the Grievance he is investigating. The Grievance investigation found that Burke made the "allegations are a way for inmate Burks to circumvent the fact that he now has a need for IPC and is having troubles mentally adjusting to the fact of that.........". The Grievance was dismissed without merit, (see items 4-18).

A review of Burks' IRC File found a Tier Hearing Packet for his IPC status. The hearing was conducted by SORC Robert Boissy who found that IPC was appropriate. The finding was appealed and upheld by SHU, (see items 19-31).

The Tier Hearing concerning the Misbehavior Report (MBR) issued by Sgt. Cross, charging Burks with fighting and unreported illness was dismissed on appeal, as there was no record of OMH status being considered, (see items 37-40).

Tapes for both the Tier Hearing resulting from the MBR and the IPC were reviewed. Those tapes show clearly that Burks maintained that he had never told Sgt. Cross that he was assaulted by inmates, but rather that he had been assaulted by staff, (see items 101, 102 and 103, respectively).

A Facility Investigation was located in the Security Office files which is directly related to this investigation. That documentation shows that on 07/07/15, during sick call, Burks reported to medical staff that he had been assaulted by staff. Sgt. John Cross responded to handle this matter. Burks was seen by medical personnel and photographed. According to Sgt. Cross' report Burks said that the day after the lockdown ended officers pulled him out of line when he was going to the East Mess Hall for chow, beat him up and then let him go to the Mess Hall to finish his meal. Burks could not provide any witnesses. Cross also reported Burks saying that he was being let out of his cell to be interviewed (apparently during the escape investigation) and the inmates on the block labeled him as a "rat". Burks said he was involved in an altercation on C-4 gallery a couple of days earlier with some inmates when they were let out for chow. Cross issued a Misbehavior Report (MBR) for failure to report an injury and fighting. Cross also reported interviewing inmates on C-4 and stated that they refused to discuss any altercation. They did reportedly tell him that no inmates were removed from the gallery during any chow run. Cross concludes that Burks wanted to get out of C-Block after being labeled as a "rat" and because of the alleged altercation, (see items 32-36).

["

## IV. Findings and Recommendation

- **Initial Allegation:** ☐ Substantiated  ☒ Unsubstantiated  ☐ Unfounded

- **Additional Allegation:** ☐ Substantiated  ☐ Unsubstantiated  ☐ Unfounded

- **Other Findings:** ☒ Yes  ☐ No

- **PREA:** ☐ PREA  ☒ Not PREA

☐ S-1   ☐ S-2   ☐ I-1   ☐ I-2   ☐ I-3

### Description of Findings:

The investigation into Burks' allegation found insufficient information to substantiate the allegation. The investigation did determine that Burks was assaulted by someone. When initially interviewed Burks identified one of the officers who allegedly came into his cell and assaulted him as Officer Nolan. When interviewed again and shown photo arrays, Burks could not identify anyone in those arrays and told Inv. Tirado that he did not know who had assaulted him. His injuries are consistent with the description of events he provided during his initial interview. Burks clearly maintained throughout the process that he was assaulted by staff, repeating the allegations during both his Tier Hearing and IPC Hearing. His initial identification of one officer and his later statement that he did not know who assaulted him, along with his mental health status (1S) casts serious doubt on his credibility, leading to the finding in this case of "unsubstantiated".

What is concerning in this matter are the Facility Investigation conducted by Sgt. John Cross and the Grievance investigation conducted by Sgt. Merit Peck.

In his investigation of Burks' allegation of assault by staff, Cross simply ignores that allegation. According to Cross Burks also alleged he was assaulted by inmates. Whether or not that was ever said is an unanswered question. However, Cross clearly ignores the possibility that Burks could have been assaulted by staff and did almost nothing to determine if Burks was assaulted by inmates. Cross attributes this to a lack of time to do an appropriate investigation.

Sgt. Peck's investigation of the Grievance defies all logic. Peck reports that the Grievance was filed on 07/02/15. Peck reported that when he interviewed Burks, that Burks' only concern was being placed in IPC and never mentioned being assaulted by staff. If the Grievance concerned an allegation of assault by staff it would seem apparent that Peck should have asked about that but he apparently did not. He then references Sgt. Cross' investigation which he attached to his packet. In attaching that document, one can only assume that he would have read it and in doing so would have seen that Burks alleged to Cross he was assaulted on 07/05/15, a full three days after the Grievance was filed. This would lead a reasonable person to conclude that these must be 2 completely separate allegations. The conclusion that Peck reaches appears to be unsupported by any facts, as he has no facts and conducted no investigation.

### Recommendation(s):

Based upon the information contained in this case file, it is recommended that this matter be submitted for review and closed as unsubstantiated.

It is further recommended that this matter be forwarded to Supt. Michael Kirkpatrick, Clinton CF and that a formal counseling be issued to both Sgts. Cross and Peck, in regards to their investigations.

CONFIDENTIAL

ATTORNEY VIEWING ONLY

4      000009

**Refer to:**

☐ N/A

☐ Bureau of Labor Relations

☐ Criminal Prosecution

☐ DOCCS Executives

☐ Community Supervision Administration

☒ Facility Administration

☐ Other

- **If Other, Explain:** Describe

**Administrative Review / Change of a Policy and Procedure:** ☒ Yes ☐ No

**Closed Case Victim Notification** ☒ Yes ☐ N/A

**Close Case Subject Notification** ☒ Yes ☐ N/A

**Report Prepared by:**

Stephan F. Weishaupt     Senior Investigator

_____     **Date:** 7/20/2016
Signature

**Report Reviewed and Approved By:**

Mark J. Miller     Deputy Chief

_____     **Date:** 8/6/2016
Signature

ATTORNEY VIEWING ONLY

CONFIDENTIAL



NEW
YORK
STATE

**Corrections and
Community Supervision**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

ATTORNEY VIEWING ONLY

### NEW YORK STATE
### DEPARTMENT OF CORRECTIONS &
### COMMUNITY SUPERVISION
### OFFICE OF SPECIAL INVESTIGATIONS
### REPORT OF INTERVIEW

NAME: ███████████

I.G. CASE#: _1183-15_

IDENTIFICATION: _____

SS# or DIN#: ███████████

DATE: _9/28/15_  TIME: _1045_

LOCATION: _Clinton CF_

INVESTIGATOR: _WEISHAUPT_

███ I HAVE BEEN AT Clinton CF FOR 10 MONTHS. I KNOW INMATE MATHIEU BURKS FROM THE Company, he locked IN 40 cell. I DON'T KNOW ANYTHING ABOUT HIM BEING ASSAULTED. BURKS MENTIONED SOMETHING ABOUT IT TO SOMEONE ON THE GALLERY BUT HE DID NOT SAY WHO DID IT. SOMETIME LATER I WAS QUESTIONED BY A HEAVYSET SGT. HE QUESTIONED SEVERAL PEOPLE. HE ASKED TO SEE MY HANDS AND WHEN ██ I ASKED HIM WHY HE TOLD ME THAT AN INMATE CLAIMED HE WAS BEAT UP BY ANOTHER INMATE. THAT WAS ALL I EVER HEARD ABOUT. ███████████████

000112

 **Corrections and Community Supervision**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

**NEW YORK STATE
DEPARTMENT OF CORRECTIONS &
COMMUNITY SUPERVISION
OFFICE OF SPECIAL INVESTIGATIONS
REPORT OF INTERVIEW**

CONFIDENTIAL

NAME: ▮▮▮▮▮▮▮▮

IDENTIFICATION: _____

DATE: 9/28/15 TIME: 11 AM

INVESTIGATOR: WEISHAUPT

I.G. CASE#: 1183-15

SS# or DIN#: ▮▮▮▮▮▮

LOCATION: Clinton CF

I HAVE BEEN AT Clinton CF FOR 7 months. I KNOW INMATE MATHIEU BURKS FROM C-4 COMPANY. A COUPLE OF MONTHS AGO BURKS WAS TELLING HIS NEIGHBOR THAT HE WAS ASSAULTED BY COs. HIS FACE LOOKED MESSED UP. I DON'T REMEMBER IF HE SAID WHO, I THINK HE JUST SAID A COUPLE OF OFFICERS. A WHILE AFTER THIS A SGT. CAME AROUND AND WAS QUESTIONING SOME OF US. HE SAID THAT BURKS TOLD HIM THAT WE (INMATES) HAD ATTACKED HIM. THAT IS ALL I KNOW ABOUT THIS. I WAS ASKED TO TESTIFY AT A BURKS' HEARING BUT I REFUSED BECAUSE THEN THE COs WOULD COME AFTER ME.


ATTORNEY VIEWING ONLY

**NEW YORK STATE
DEPARTMENT OF CORRECTIONS &
COMMUNITY SUPERVISION
OFFICE OF SPECIAL INVESTIGATIONS
REPORT OF INTERVIEW**

CONFIDENTIAL

NAME: ▮▮▮▮▮▮▮▮

IDENTIFICATION: _____

DATE: 9/28/15  TIME: 1115am

INVESTIGATOR: WEISHAUPT

I.G. CASE#: 1183-15

SS# or DIN#: ▮▮▮▮▮▮

LOCATION: Clinton CF

I HAVE BEEN AT CLINTON CF SINCE MAY OF 2014. I AM HOUSED ON C-4 AND HAVE BEEN THERE FOR A COUPLE OF MONTHS. I DON'T KNOW INMATE BURKS. I RECOGNIZE HIM FROM THE BLOCK BUT I DON'T KNOW HIM AT ALL. HE NEVER SAID ANYTHING ABOUT BEING ASSAULTED. A SGT. CAME BY AND CHECKED OUR HANDS. HE SAID THAT BURKS WAS CLAIMING THAT INMATES DID SOMETHING TO HIM. I WAS ASKED TO TESTIFY AT A TIER HEARING BUT I REFUSED BECAUSE I DIDN'T REALLY KNOW THE INMATE.

FORM 2178A (04/14)

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

_Clinton_ CORRECTIONAL FACILITY

REQUESTED INMATE WITNESS REFUSAL TO TESTIFY IN TIER II OR TIER III DISCIPLINARY HEARING

I, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ hereby refuse to testify on behalf of

(Inmate Witness, Last Name, First Name)       DIN #

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in his Tier II/III hearing for a misbehavior

Accused Inmate Last Name, First Name       Date

report dated _7-21-15_ for the following reason(s):

Date (MM/DD/YEAR)

Please give *specific* reason(s) for refusing to testify:

I was not around when what events happened.

If the Hearing Officer is not satisfied with the reason given, the inmate witness may be called upon to clarify his refusal.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                 _7-21-15_

                                Date

_S. ▓▓▓▓▓  CO_                 _7-21-15_

Employee Signature              Date

▓▓▓▓▓▓▓▓▓▓▓▓▓ was specifically asked to provide a reason for his refusal to testify and

Name

refused to provide further information.

_____          _____
Employee Signature                 Date

Hearing Officer met with inmate to discuss refusal and obtain further details.

_____          _____
Hearing Officer Signature           Date

CONFIDENTIAL

ATTORNEY VIEWING ONLY

FORM 2176A (03/14)

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

_Clinton_ CORRECTIONAL FACILITY

### REQUESTED INMATE WITNESS REFUSAL TO TESTIFY IN TIER II OR TIER III DISCIPLINARY HEARING

I, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ hereby refuse to testify on behalf of

_____ in his Tier II/III hearing for a misbehavior
<span style="font-size:small">Accused Inmate Last Name, First Name</span>    <span style="font-size:small">DIN #</span>

report dated _7/21/15_ for the following reason(s):
<span style="font-size:small">Date (MM/DD/YEAR)</span>

Please give *specific* reason(s) for refusing to testify:

_I do not know that person._

_____

_____

_____

_____

_____

_____

If the Hearing Officer is not satisfied with the reason given, the inmate witness may be called upon to clarify his refusal.

▮▮▮▮▮▮▮▮▮▮ _7/21/15_
<span style="font-size:small">Date</span>

_S. _____ CO_ _7/21/15_
<span style="font-size:small">Employee Signature</span>    <span style="font-size:small">Date</span>

_____ was specifically asked to provide a reason for his refusal to testify and
<span style="font-size:small">Inmate Witness Name</span>

refused to provide further information.

_____ _____
<span style="font-size:small">Employee Signature</span>    <span style="font-size:small">Date</span>

Hearing Officer met with inmate to discuss refusal and obtain further details

_____ _____
<span style="font-size:small">Hearing Officer Signature</span>    <span style="font-size:small">Date</span>

CONFIDENTIAL

**ATTORNEY VIEWING ONLY**

000043

FORM 2176A (07/14)

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

_Clinton_ CORRECTIONAL FACILITY

### REQUESTED INMATE WITNESS REFUSAL TO TESTIFY IN TIER II OR TIER III DISCIPLINARY HEARING

I, ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ , hereby refuse to testify on behalf of
    <small>Inmate Witness, Last Name, First Name</small>     <small>DIN #</small>

_____ _____ in his Tier II/III hearing for a misbehavior
<small>Accused Inmate Last Name, First Name</small>    <small>DIN #</small>

report dated _____ for the following reason(s):
    <small>Date (MM/DD/YEAR)</small>

Please give *specific* reason(s) for refusing to testify:

I don't know him

_____

_____

_____

_____

_____

_____

_____

If the Hearing Officer is not satisfied with the reason given, the inmate witness may be called upon to clarify his refusal

▓▓▓▓▓▓▓▓▓▓▓       7/21/15
  <small>Inmate Signature</small>            <small>Date</small>

S. _____ CO       7/21/15
  <small>Employee Signature</small>          <small>Date</small>

_____ was specifically asked to provide a reason for his refusal to testify and
   <small>Inmate Witness Name</small>

refused to provide further information.

_____    _____
   <small>Employee Signature</small>              <small>Date</small>

Hearing Officer met with inmate to discuss refusal and obtain further details

_____    _____
   <small>Hearing Officer Signature</small>          <small>Date</small>

CONFIDENTIAL

**ATTORNEY VIEWING ONLY**

000044

Q & A of:  JOHN CROSS

STATE OF NEW YORK
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

-------------------------------------------------------------

In the Matter

-of-

Case Number IAD 15/1183

-------------------------------------------------------------

TRANSCRIPT OF PROCEEDINGS held in the

above-entitled matter on the 14ᵗʰ day of October 2015,

commencing at, approximately, 9:10 a.m., at the New York

State Department of Corrections and Community Supervision,

State Campus, Building 2, Albany, New York.

APPEARANCES:

FOR THE OFFICE OF SPECIAL INVESTIGATIONS

STEPHAN WEISHAUPT
Senior Investigator

FOR THE CORRECTIONS OFFICERS

LIPPES MATHIAS WEXLER FRIEDMAN L.L.P.
54 State Street, Suite 1001
Albany, New York 12207-2515
BY: LAWRENCE R. SCHAEFER, ESQ.

ALSO PRESENT:  NICK MOORE, Chief Steward/Clinton CF
RICKY BRUNELLE, Northern Region Business Agent

ATTORNEY VIEWING ONLY

REPORTED BY:  Cynthia Schultz

LEGUIRE SHORTHAND REPORTERS
(518) 371-4143

000077

1                    **P R O C E E D I N G S**

2                         (Prior to the commencement of the Q&A,

3                    State's Exhibit Number 1 was marked for

4                    identification, this date.)

5                         **J O H N   C R O S S,**

6          having been first duly sworn by the Notary Public, was

7          examined and testified as follows:

8     EXAMINATION BY MR. WEISHAUPT:

9     Q    All right.  For the record, my name is Steve

10         Weishaupt.  I'm a Senior Investigator with the Office

11         of Special Investigations and you've been ordered here

12         today as part of an investigation my office is

13         conducting.  Before we go any further, I'm gonna give

14         you a copy of Department Directive 0102 and ask that

15         you review that with your attorney.

16                         MR. SCHAEFER:  We went over this

17              beforehand.  Do you have any questions of me?

18                         THE WITNESS:  No.  Nothing.

19                         MR. SCHAEFER:  Do you understand all your

20              rights?

21                         THE WITNESS:  Yes.  I do.

22                         MR. SCHAEFER:  Okay.  Sergeant Cross is

23              compelled here to testify.  Is that correct?

24                         MR. WEISHAUPT:  That's correct.

25                         MR. SCHAEFER:  Okay.  We'll get a copy of

ATTORNEY VIEWING ONLY


| | | |
|---|---|---|
| 1 | | the transcript after it's completed? |
| 2 | | MR. WEISHAUPT: You will. |
| 3 | | MR. SCHAEFER: Very good. Thank you. |
| 4 | | MR. WEISHAUPT: We'll note your request, |
| 5 | | for the record. |
| 6 | | MR. SCHAEFER: I appreciate it. |
| 7 | BY MR. WEISHAUPT: (Continued) | |
| 8 | Q | For the record, would you state your full name and |
| 9 | | title, please? |
| 10 | A | It's John Mark Cross, Sergeant at Clinton Correctional |
| 11 | | Facility. |
| 12 | Q | Sergeant Cross, how long have you been with the |
| 13 | | Department? |
| 14 | A | I got two seniority dates. I started in March of '84. |
| 15 | Q | Okay. |
| 16 | A | In June of 2000, I was terminated for a Worker's Comp |
| 17 | | injury, and I was reinstated in January of 2005. I |
| 18 | | have a seniority date now of 10/20 of '90. |
| 19 | Q | Okay. What did they do, combine them? |
| 20 | A | They just - the time that I was out was, basically, |
| 21 | | for a Worker's Comp thing and I was terminated, so it |
| 22 | | took a while to get my job back. |
| 23 | Q | How long have you been a sergeant? |
| 24 | A | July 12th, 2010, five years. |
| 25 | Q | Okay. And how long have you been at Clinton? |

| | | |
|---|---|---|
| 1 | A | Since February 16, 2012. As a sergeant. |
| 2 | Q | I'm gonna show you what's been marked as State's |
| 3 | | Exhibit 1 for identification and ask you to review |
| 4 | | those documents. |
| 5 | | (The witness examined the documents.) |
| 6 | A | Okay. Yeah. There was pictures also with this, too. |
| 7 | | You know that. Right? |
| 8 | Q | Yes. |
| 9 | A | Okay. |
| 10 | Q | Have you had a chance to review that and can you |
| 11 | | identify that document for me? |
| 12 | A | Yes. It was a To/From that I wrote for Captain |
| 13 | | Devlin. |
| 14 | Q | This regarded an Inmate Burks? |
| 15 | A | Yes, sir. |
| 16 | Q | DIN Number 14A5477? |
| 17 | A | Yes. |
| 18 | Q | Okay. How did you come to be involved with this |
| 19 | | incident, or whatever it was? |
| 20 | A | The morning of the 7th, I was the Hospital Sergeant. I |
| 21 | | had the Hospital Sergeant at Clinton Correctional |
| 22 | | Facility, it was my bid at the time. I don't any |
| 23 | | more. I was doing a - I was on the 2nd Floor. I was |
| 24 | | doing a contraband protocol for an inmate who was on a |
| 25 | | contraband watch. |

ATTORNEY VIEWING ONLY

000080

1       I got notified via the radio system that the 1
2   Floor Hospital, where there were sick calls being
3   held, needed my attention.  So I called down there to
4   find out what was going on, 'cause we were dealing
5   with the inmate that had the contraband watch.

6       One of the officers answered the phone.  Stated
7   that, "Nurse Khann needs to see you in regards to an
8   inmate."  I says, "I'll be right down."  We put the
9   inmate back inside his cell.  That has to be
10  supervised.

11      I went downstairs to see Nurse Khann.  She says,
12  "I have Inmate Burks here, stated that he got beat up
13  by staff."  I says, "Okay.  Fine."  I had an officer
14  take him upstairs to the emergency room.  And I asked
15  her if there was any statement or anything that he
16  gave.  She said that, "All he said is he was beat up
17  by staff."

18      I took him upstairs to the emergency room, and I
19  believe it was Nurse Fitzgerald is the one who was
20  giving him medical treatment.  He did have injuries.
21  He had something with his, I'm not sure what eye it
22  was, but there was a small mark on his eye.

23          MR. WEISHAUPT:  Cynthia, would you mark
24      that as one item, please.

25          (State's Exhibit Number 2, consisting of

ATTORNEY VIEWING ONLY

1               eight pages, was marked for identification, this

2               date.)

3    Q    I'm gonna show you what's been marked State's Exhibit

4         2 for identification, which is a set of eight

5         photographs.  Take a look at those and tell me if

6         those are the photographs that you directed be taken.

7                   (The witness examined the photographs.)

8    A    Yes.  They are, sir.

9    Q    Okay.  And they depict an injury to his left eye?

10   A    Yes.  And he complained of left eye and back of his

11        elbow and he complained of pain in the back of his

12        neck.

13   Q    Okay.

14   A    I believe that's all documented on there.  Medical

15        report, also.

16   Q    Okay.  So what did you do then?

17   A    What I did is, he was being treated.  Once the

18        treatment was done, he was then still in the ER.  I

19        asked him what had happened.  He said that on July 5ᵗʰ

20        he was going to Chow.  And I asked him three times,

21        what Chow?  He said he didn't remember.  But he only

22        went to Chow three times that day 'cause July 5ᵗʰ was a

23        Sunday.

24             That he was walking from C-Block to D-Block in

25        the hallway, going up the stairs.  And by the D-Block

ATTORNEY VIEWING ONLY

1    gate, he said an officer pulled him out, beat him up,

2    put him back in line, and let him go to Chow.

3  Q    Okay.

4  A    So I asked him who the officer looked - what the

5    officer looked like. He said he didn't know. I asked

6    him if there was any inmates that saw this that I

7    could verify this with. He said there wasn't any. He

8    didn't have any names and numbers of any inmates.

9    I asked him if there was any other officers

10    around that saw this. He said, "No." I asked if he

11    had reported this to anybody, prior to today, and he

12    said, "No."

13    So, I was still doing some more paper work and

14    stuff. The Porters from C-4 Company, which is the

15    same Company that he locks on, are Hospital Porters.

16    I have Porters on the 1st Floor, the floor that I was

17    on with the ER, I have Porters on the 2nd Floor, which

18    is the floor that houses inmates for the outside

19    trips, special watches, and ISO cells, and then we

20    have Porters on the 3rd Floor, which is OMH.

21    I then asked every one of them individually if

22    they went to Chow, and the ones that went to Chow on

23    that day - some went to two meals, some went to three

24    meals - said that there was no altercation that came

25    across at all.

ATTORNEY VIEWING ONLY

1           Then I asked them, point blank, said, "Listen,

2         was there anything that happened in the hallway to or

3         from Chow with any inmate?" "No, Sarge. There was

4         nothing." I asked them individually, by themselves.

5         They all told me nothing happened to him from Chow,

6         with him.

7  Q    Okay.

8  A    So, I come back downstairs. I asked them if there was

9         any altercations or anything that happened in or out

10       of the Mess Hall, or anything at all, and they said,

11       "No."

12           So I went back downstairs. I told Inmate Burks

13       that I had just interviewed about 20% of his

14       population that goes to Chow with him. There's seven

15       inmates, there's 30 some-odd inmates on the Company.

16       So I'm working rough figures here. But I interviewed

17       seven inmates.

18  Q    Okay.

19  A    And all of them told me nothing had happened going to

20       and from Chow.

21  Q    Okay.

22  A    I asked him to start telling me what's really going

23       on, and he tells me that he's been pulled out of the

24       Block after the Joyce Mitchell escape, or the escape

25       that Joyce Mitchell helped with, 'cause he was in the

ATTORNEY VIEWING ONLY

1       Tailor I shop.

2   Q     Okay.

3   A     He said he'd been pulled out, like, four, five
4       different times. He mentioned all kinds of agencies.
5       The CIU team came down and got him. The BCI
6       investigated him. The IG investigated him. He said
7       there was even some guys from the State Police and the
8       CIU. Apparently, after each time - what these people
9       were doing, they were doing snatch-and-grab inmates
10      out of the Block.

11   Q     Okay.

12   A     And they labeled him as Joyce Mitchell's boy toy and
13      that he was a rat. And he said a couple days prior to
14      the story he then came up with for this about being
15      beat up, he got into an altercation with a group of
16      inmates on the Company.

17   Q     Okay.

18   A     Okay. Fine. So I go back upstairs. I go to the same
19      Porters as before, into the same isolated rooms, and
20      stated to them, "What happened on 4-Company? Was
21      there an incident that took place on 4-Company in the
22      last couple of days?

23      "Sergeant Cross, I can't talk about it." I said,
24      "What do you mean?" "You've been around long enough.
25      You know I can't talk about it." I says, "Okay.

1    Fine."

2    So I checked their hands, and there was nothing
3    on their hands at all, or any type of defensive
4    wounds.  But when an inmate tells me that there's
5    something that happened on that Company, then I'm apt
6    to believe that what he's now telling me - that he got
7    involved with an altercation with an inmate - then
8    that's the situation that transpired, and that's the
9    route I went with.

10 Q  Okay.  Did you interview any other inmates on the
11   Company?

12 A  No.  I didn't have the opportunity.

13 Q  Okay.

14 A  I'm not being sarcastic, but, I mean, with the
15   Hospital and other duties and stuff.  When the inmates
16   came back and told me that, "Sarge, we're not gonna
17   talk about it," that's telling me that there's an
18   issue.

19    When they told me, flat out, before that, "No.
20   This didn't happen," if they would have told me that
21   "No.  It didn't happen," then I would have had to use
22   another alternative for an investigation.

23 Q  Did you document any of these interviews?

24 A  Only on - only on that paper right there (indicating).

25 Q  So you -

1   A     The C-4 inmates that I'm talking about on there are

2         Porters from -

3   Q     I'm talking about Exhibit 1.  There's no other

4         documentation, then, that exists?

5   A     No.

6   Q     So how can I tell which inmates you interviewed?

7   A     Some of the Porters still work at the facility.  Some

8         of them.  I'm not sure.

9   Q     How can I tell what inmates you interviewed?

10  A     I don't know that you're gonna be able to.

11  Q     Can you tell me who they were?

12  A     I know there's three of them still working in OBS.  I

13        don't know their names, but I know what they look

14        like.

15  Q     Okay.

16  A     For his safety and security in there, I didn't put

17        inmates' names and numbers.  Maybe I should have, but

18        I didn't.

19  Q     Well, the problem I have with this is, I interviewed

20        three inmates and all the inmates told me the same

21        thing - and I interviewed them individually on

22        different dates, I believe - that you came and talked

23        to them, and you asked to see their hands, and you

24        told them that this inmate had told you that he was

25        beaten up by another inmate.  You never mentioned

ATTORNEY VIEWING ONLY

| | | |
|---|---|---|
| 1 | | anything about staff. All these other inmates told me |
| 2 | | that they were aware that Burks was claiming he was |
| 3 | | assaulted by staff. Did you ever speak to any staff? |
| 4 | A | No. |
| 5 | Q | Did he claim, to you, initially, that he'd been |
| 6 | | assaulted by staff? |
| 7 | A | While going to the Mess Hall. Yes. |
| 8 | Q | Okay. Look, we know each other, we've known each |
| 9 | | other a long time. I'm gonna be straight up front |
| 10 | | with you. This thing looks like a cover-up. |
| 11 | A | Let me ask you a question, if I can. |
| 12 | Q | Go ahead. |
| 13 | A | What are the possibilities of an inmate, in a hallway, |
| 14 | | being taken out, beat up by an officer in front of |
| 15 | | other inmates, and put back in going to Chow? |
| 16 | Q | That's not the story he told me. |
| 17 | A | But that's - that's what he told me. |
| 18 | Q | Okay. Did you take a statement from him? |
| 19 | A | From him? |
| 20 | Q | Yeah. |
| 21 | A | That statement that should be right there |
| 22 | | (indicating), the top part of it. |
| 23 | Q | Did you take anything that he signed? |
| 24 | A | Only the VPC refusal form. That's the only thing I |
| 25 | | took from him. |

ATTORNEY VIEWING ONLY

| | | |
|---|---|---|
| 1 | Q | And you didn't take statements from any of these other |
| 2 | | inmates? |
| 3 | A | No.  I did not.  And we don't do that. |
| 4 | Q | Okay. |
| 5 | A | I mean, that's the thing, we don't.  I mean, I don't - |
| 6 | | we don't have an inmate write a To/From for us and |
| 7 | | then have the inmate sign it and put it in the |
| 8 | | investigation. |
| 9 | Q | Okay.  What you're telling me, I guess, is that you're |
| 10 | | getting two different stories.  Is that right?  You |
| 11 | | got two different stories? |
| 12 | A | Two different stories from him. |
| 13 | Q | Okay. |
| 14 | A | And I followed the more believable story.  And when I |
| 15 | | talked to the inmate Porters that were up in the |
| 16 | | Hospital, they sort of, like - they sort of made it |
| 17 | | look like what he was saying about going to and from |
| 18 | | Chow was bullshit - excuse the language - okay, and |
| 19 | | that there was an altercation that happened on the |
| 20 | | Company. |
| 21 | Q | Okay.  But they didn't confirm that? |
| 22 | A | They didn't come out and say it.  No.  All they said |
| 23 | | is, "Sergeant Cross, what happens on the Company, |
| 24 | | that's - it's not important."  They wouldn't answer |
| 25 | | any questions about it, which leads me to believe that |

| | | |
|---|---|---|
| 1 | | they don't wanna be labeled as a rat. |
| 2 | Q | Okay. You think if a couple officers smacked this guy |
| 3 | | around that they would tell you that? |
| 4 | A | Those guys, at this point in time? Yes. I do. With |
| 5 | | what's going on in the facility right now, yes. I do. |
| 6 | | And if they would have, then we would have had to |
| 7 | | pursue it differently. You'd be finishing the |
| 8 | | investigation. |
| 9 | Q | If you're getting contrary stories from somebody, |
| 10 | | doesn't it make sense to take a written statement? |
| 11 | A | If they're believable. |
| 12 | Q | Well, if somebody's giving you two stories, they can't |
| 13 | | both be believable. |
| 14 | A | Correct. And when I went - when I - the thing - the |
| 15 | | way I validated it is, I went to the inmates and the |
| 16 | | inmates said there was nothing that happened in the |
| 17 | | hallway going to and from Chow. |
| 18 | Q | That's not what they're telling me they told you. |
| 19 | A | The Porters? |
| 20 | Q | So if, in fact, they said that, there's no |
| 21 | | documentation of it. Is that correct? |
| 22 | A | Correct. There is no documentation. |
| 23 | Q | So you could tell me they told you anything. Right? |
| 24 | A | Yeah. I suppose I could. |
| 25 | Q | Okay. |

ATTORNEY VIEWING ONLY

| 1 | A | I'm not that type of person, but I suppose I could. |
| 2 | Q | Right. I've got signed statements from them telling |
| 3 | | me something different. You never talked to any staff |
| 4 | | about this? |
| 5 | A | No. I did not. |
| 6 | Q | So that part of the complaint, you just blew that off? |
| 7 | A | I didn't have any staff members to go to talk to. |
| 8 | Q | Okay. |
| 9 | A | I don't know who was in the hallway at that time. |
| 10 | Q | Okay. You don't know who worked on that Block? |
| 11 | A | The Block, I could have got a 1st and 2nd man, but he |
| 12 | | said it took place in the hallway. |
| 13 | Q | Okay. Did you ever check with the 1st or 2nd man to see |
| 14 | | if anybody had seen these injuries and what date they |
| 15 | | appeared on the inmate? |
| 16 | A | No. I did not. |
| 17 | Q | Did the inmate tell you that he initially reported |
| 18 | | this during sick call on the 6th? |
| 19 | A | No. He reported it on the 7th during sick call. |
| 20 | | That's the day I got called down. |
| 21 | Q | Did he tell you that he reported it on the 6th to the |
| 22 | | nurse making rounds on the Company? |
| 23 | A | No. He did not. |
| 24 | Q | That nurse ever report anything, that you're aware of? |
| 25 | A | Nothing to me. No. |

ATTORNEY VIEWING ONLY

1    Yes.

2  Q   Okay.  Did you talk to any of the officers?

3  A   There wasn't - there was just the 1st and 2nd men were

4      on the Block.

5  Q   Did you talk to them?

6  A   No.  I didn't want them to know what I was there for.

7  Q   Okay.  Those officers that worked the Block have a

8      pretty good idea what's going on down there?

9  A   Yes and no.  Depends on the staff.

10 Q   Okay.

11 A   We got a lot of new staff.  I don't think they know

12     these inmates individually.

13 Q   Okay.  You would think that they would know if an

14     inmate on their Block was injured.  Right?

15 A   You would hope that they would know that, at this

16     point in time.

17 Q   But you didn't check?

18 A   No.  I did not.

19 Q   Now, you attended the IPC hearing?

20 A   Yes.  I did.

21 Q   Did this inmate say, at the IPC hearing, that he was

22     assaulted by staff?

23 A   I don't recall, but I'm not positive.

24 Q   Okay.  Did he also say, during that hearing, that when

25     you brought up the business about him being assaulted

ATTORNEY VIEWING ONLY

[Proceedings - CROSS]

18

1      by another inmate, did he say that he had told you a

2      number of times that that's not correct?

3  A   No. Not that I remember.

4  Q   Okay. Well, I listened to the tape and that's what he

5      said.

6  A   Okay.

7  Q   So, I don't understand - this is what I'm looking at

8      here. I don't understand how you can just write that

9      allegation off when we don't know when, where, or how

10     he was injured. I don't understand how you can write

11     that off. That's what I'm looking for an explanation

12     for.

13       He claimed it in the Tier hearing on the ticket.

14     He claimed it again in the IPC hearing. He claimed it

15     to you and he claimed it to me. Now - regardless of

16     any other claims he may or may not have made. But

17     he's saying he never said inmates assaulted him.

18     That's what he's telling me.

19  A   He told me he was.

20  Q   So, in light of the fact that he's saying, on numerous

21     occasions, that staff assaulted him, you did noting

22     with that allegation. Is that correct?

23  A   He told me one specific allegation, that he got

24     assaulted going to Chow.

25  Q   Okay. But he said again, during his -

LEGUIRE SHORTHAND REPORTERS
(518)371-4143

000094

19 /8

(Proceedings - CROSS)

1  A    I don't remember.

2  Q    - Tier hearing and during the IPC hearing that,

3       specifically, he was assaulted by staff. And this is

4       what I'm dealing with here. No where do you even

5       address that except almost as an ancillary incident in

6       here. We just go to, another inmate beat him up, and

7       then you didn't even follow through on that. So I'm

8       looking for an explanation.

9             MR. SCHAEFER: Could we get a short break?

10            MR. WEISHAUPT: Yeah.

11            MR. SCHAEFER: Thank you.

12            (A brief recess was taken in the record.)

13  BY MR. WEISHAUPT: (Continued)

14  Q    When you get an investigation like this - and,

15       obviously, you initiated this one based on what the

16       nurse told you - is there a time frame to complete

17       these?

18  A    Yeah. He wants it done, usually, ASAP. Usually that

19       day. Or sooner. The Captain wants that to follow up.

20  Q    Did you ever take longer than that to do one?

21  A    Nope.

22  Q    Did you ever say to the Captain, "I don't know what's

23       going on here. I need further investigation?"

24  A    There's no way - there's no way I can go to the

25       Captain and say that. There's no way I can go to the

1    Captain and say that. Based off the information that

2    he gave me - okay - based off the information - he

3    didn't give me any what the officer looked like, or

4    what an officer looks like. Whether he was black,

5    white, Hispanic, whether he was tall, short, fat,

6    whether it was a male or female. He didn't say

7    anything at all. All he said is that he got beat up

8    going to Chow in the Company.

9    No other inmates on that Gallery, when I

10    interviewed those Porters, said to me that anything

11    happened in that hallway. And I know, from past

12    experiences, that an inmate's not gonna get beat up in

13    that hallway, in that situation, 'cause the other

14    inmates wouldn't allow it.

15    We would have had a major level, we would have

16    had a major disturbance, and the inmates would have

17    taken over, tried to take over that area. They're not

18    gonna let staff do that to an inmate in the hallway.

19    Based off that -

20  Q   Should I imply from that that they do it someplace

21    else?

22  A   No. No. I didn't mean it that way. No. I

23    apologize. No. I did not.

24  Q   Okay.

25  A   I'm just saying, in a hallway, if there's - inmates

1      control the hallways. 'Cause there's 35, 50 inmates

2      in a group going to and from Chow, and we've got one

3      Escort Officer, maybe two officers at that gate area.

4      Two, maybe three or four at the most. At that gate

5      area. He can't identify any of those inmates or

6      officers that are standing there? He can't tell me if

7      the guy is six-foot-two with a bald head and sleeves

8      rolled up, or that he has chewing tobacco in his

9      mouth, or that it was a male or female that was

10     standing next to him?

11  Q  What did the inmate that he said he got in the

12     altercation with look like?

13  A  He didn't. He said he got jumped by a bunch of

14     inmates on the Company.

15  Q  Okay.

16  A  That's what he told me. Now, based off of what he

17     told me, and the time frame that I've got to do this

18     plus run the Hospital and stuff, I don't have the

19     luxury of a two to three-week investigation to do

20     this. And I went and did as much as I could as quick

21     as I could to get this thing taken care of with those

22     Porters. The Porters, I just got lucky that those

23     Porters were in the Hospital at the time. And we

24     don't take written statements.

25  Q  When did you go to the Company and interview the

ATTORNEY VIEWING ONLY

(Proceedings - CROSS)                                                    22

1    inmates there?

2  A    That afternoon. That - later on that morning.

3  Q    But given that you normally don't get written

4       statements, do you document who you talk to in any

5       way?

6  A    No. I know that we don't 'cause it's going to the

7       inmate. I don't want that inmate to get a copy of

8       that. That might jeopardize the safety and security

9       of the other inmates that I dealt with.

10 Q    Do you write it some place else, something that the

11      inmate won't get?

12 A    No. It's not a common practice in our facility to do

13      that.

14 Q    Okay.

15 A    I'm just saying, with the information that he gave me,

16      when I spoke to those Company Porters, inmates, and

17      they're telling me that this didn't happen in the

18      hallway, that pretty much - and that's the only thing

19      he told me about how he got assaulted. Okay?

20           Of course, he looks at me totally different than

21      he looks at you when he's - when somebody's - when

22      he's doing an investigation. He's not looking at us

23      both the same way. You go down with my uniform on, I

24      go down with your suit and tie on, he's gonna look at

25      us totally different.

(Proceedings - CROSS)                                    23

1   Q    Okay.

2   A    All right? I'm just saying - I mean, I'm not trying

3        to say - I'm not trying to be a wise guy here, sir.

4        But he gave me information. I took that information

5        and went as far as I could go with it.

6   Q    Okay.

7   A    Okay? I'm not saying that I shouldn't have probably

8        got staff names and numbers, but he didn't give me

9        staff names and numbers to do those investigations

10       with.

11  Q    Okay. The problem -

12  A    And I'll say something else. If there was something

13       that came up, this would have been forwarded to the

14       Captain and he would have handled it with the proper

15       channels.

16  Q    Okay. The bottom line here is, you didn't do any

17       investigation at all, did you?

18  A    I did what he told me to do

19                 MR. SCHAEFER:  Who's "he?"

20                 THE WITNESS:  The inmate.

21  Q    You did what the inmate told you?

22  A    I did - I did what the inmate gave me information

23       from.

24  Q    Okay. But you didn't really investigate anything.

25       You didn't go talk to staff?

(Proceedings - CROSS)                                    24

| | | |
|---|---|---|
| 1 | A | No. I didn't. No. |
| 2 | Q | You didn't go talk to other inmates? |
| 3 | A | I did talk, I talked to other inmates. |
| 4 | Q | You talked to the Porters that were present in the |
| 5 | | Hospital. |
| 6 | A | Correct. |
| 7 | Q | And you said you went down to the Gallery, but you |
| 8 | | never talked to any staff. |
| 9 | A | I didn't have any staff members to talk to. |
| 10 | Q | Okay. Did you check the log books to see who was |
| 11 | | working? |
| 12 | A | No. I did not. |
| 13 | Q | Okay. So this just ended. Okay? Now, later, the |
| 14 | | inmate continued to claim that he was assaulted by |
| 15 | | staff. |
| 16 | A | Not to me. |
| 17 | Q | You were present at the IPC hearing? |
| 18 | A | I might have been present at the IPC hearing but he |
| 19 | | could have been talking - he didn't tell - I don't |
| 20 | | recall what happened at the hearing. |
| 21 | Q | He said it on tape. |
| 22 | A | Okay. |
| 23 | Q | He said it to the Hearing Officer, that he didn't |
| 24 | | understand if there was a mis-communication regarding |
| 25 | | what had happened. He said he never claimed he was |

(Proceedings - CROSS)                                        25

1        assaulted by inmates.  He claimed he was assaulted by

2        officers, and that, in fact, he was assaulted by

3        officers.  That's what he said in the hearing.

4              Now, we know he said that at the Tier hearing,

5        because the person conducting the hearing forwarded

6        his complaint to the Captain and Lieutenant.  So we

7        know he claimed it there again.  And we know he filed

8        a grievance saying he was assaulted by officers.

9              So I'm just - I'm looking at this whole thing,

10       and it's not just your documentation either.  It's

11       other documentation.  So, basically, you took the

12       information he gave you, you put it on paper, and that

13       was the end of it?

14   A   Pretty much.  Yes, sir.

15                   MR. WEISHAUPT:  Okay.  I'm done.

16                   MR. SCHAEFER:  Let me talk to Sergeant

17              Cross.

18                   MR. WEISHAUPT:  Okay.

19                   (A brief recess was taken in the record.)

20   BY MR. WEISHAUPT:  (Continued)

21   Q   I've got one quick question before we close this.  Do

22       you know what happened to the ticket you wrote?

23   A   No idea.  I know he got put in IPC.  I got no idea

24       what happened to the ticket.  I never looked up on it.

25       That's in the Tier hearing and the Lieutenant's hands.

(Proceedings - CROSS)

1   Q   Okay.

2   A   I honestly don't remember him saying anything when we

3       were at the hearing.

4   Q   Okay.

5   A   The question that I have is, with everything that we

6       have to do in the course of our duties as supervisors,

7       we have to take the shortest possible route to get an

8       investigation done.  Like I said, hey, if he had come

9       up and identified a staff member or something, you

10      know what?  I would have turned that over, 'cause I

11      don't want staff members like that working at our

12      facility.

13          Maybe there was something that I could have added

14      into that thing that would have been a lot better, as

15      far as names and numbers, but I'm protecting those

16      inmates that did - that I did talk to, for their

17      safety and security too.

18          With what he gave me, and with the plan that we

19      have for doing investigations, is the reason that was

20      done in that manner.  Okay?  Now, if I had - if we had

21      a sergeant that could go around and just do

22      investigations for this kind of stuff, claims

23      investigations, that kind of stuff, it would probably

24      be a little bit more in depth to it if we didn't have

25      normal duties during the day.

(Proceedings - CROSS)

1    But I'm running four floors of the Hospital.

2    Supervising 30 to 40 officers as well as hundreds of

3    inmates, some of them mentally unstable. Plus

4    civilian staff. So - I'm not using that as an excuse.

5    I'm not using it as an excuse.

6    All I'm saying is, when this happens, they want

7    you to take care of it and get it done. And the

8    information he gave - had he given me other

9    information, had those Porters said, "Yeah. Something

10   happened," I would have went back downstairs and said,

11   "Okay, listen. I got some people saying something

12   happened. What's this inmate look like? What's the

13   officer look like?"

14   But when I spoke to him, he did not give me any

15   information other than that he got beat up going to

16   Chow, by an officer, in that Company, in front of that

17   gate, and by D-Block. And I'm telling you, that

18   doesn't happen at Clinton.

19         MR. WEISHAUPT: Okay. I'm finished.

20         (Whereupon, the examination of JOHN CROSS,

21      in the above-entitled matter, was concluded at

22      9:50 a.m.)

23

24

25

28

**I N D E X   T O   E X H I B I T S**

| STATE'S | DESCRIPTION | FOR ID |
|---------|-------------|--------|
| 1 | To/From | 2 |
| 2 | Eight Photographs | 5 |

\* \* \* \* \*

**C E R T I F I C A T I O N**

I, CYNTHIA SCHULTZ, a Shorthand Reporter and
Notary Public in and for the State of New York,
do hereby CERTIFY that the foregoing record taken
by me at the time and place as noted in the
heading hereof is a true and an accurate transcript of
the same, to the best of my ability and belief.

ATTORNEY VIEWING ONLY

CYNTHIA SCHULTZ

DATED: 10/19/15

CONFIDENTIAL

LEGUIRE SHORTHAND REPORTERS
(518) 371-4143

000104

2

**THE FOLLOWING EMPLOYEE IS TO BE ORDERED IN** and is to report in Class "A" uniform. The employee being notified may have personal counsel or union representation present during this interrogation, in accordance with Directive 0102:

Employee to be ordered in: Sgt. John Cross

Location: Building 2, State Campus, Albany, NY

Date and Time: Thursday October 15, 2015

Investigator: S/I Stephan F. Weishaupt

**Once the employee is officially notified, please ensure that the employee is provided a copy.**
**\*Return copy by fax to the Albany Office of Special Investigations at (518) 485-1821 or**
**PDF to the Office of Special Investigations at: SpecialInvestigations@doccs.ny.gov**

**Please be advised, a stenographic record will be created.**

---

Name and Title of person notifying employee of interview:

Print Name/Title:_____ Signature:_____

Date employee was notified:_____ Time notified _____:_____ am/pm

Employee:_____ Title:_____
      (Print)                                 (Print)
Employee Signature:_____

Employee notified: In person_____ or \*by phone at (  )_____-_____ Time:____:____ am/pm

**\* If the original notification is by telephone, the person placing the call to the employee shall have the employee sign the notification no later than the first day he or she returns to work following telephone notification.**
**The original signed "24 Hour Notification" will be retained by the D.S.S., and turned over to the Office of Special Investigations Investigator.**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

## OFFICE OF SPECIAL INVESTIGATIONS
## "24 HOUR NOTIFICATION" (NYSCOPBA)

**TO:**      Michael A. KirkPatrick, Superintendent, Clinton CF

**FROM:**    Stephen J. Maher, Chief

**SUBJECT:** Official Notification of Questioning

**DATE:**    10/06/15

---

Please notify the employee identified by C.O.B./A.S.A.P, that they will be questioned as part of an official investigation by the Office of Special Investigations.
**Questioning Regarding (Check all that apply); include when possible on or about date and time:**

____   Use of Force _____

____   PREA Complaint _____

____   Off Duty Arrest _____

____   False Documents _____

____   Electronic Device _____

____   Order of Protection _____

**XX**   **Other (Describe; include on or about date and time) Assault investigation on 07/07/15.**

---



NEW YORK STATE | Corrections and Community Supervision

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

**NEW YORK STATE
DEPARTMENT OF CORRECTIONS &
COMMUNITY SUPERVISION
OFFICE OF SPECIAL INVESTIGATIONS
REPORT OF INTERVIEW**

NAME: _MATTIEW BLIRKS_

IDENTIFICATION: _____

DATE: _8/7/15_ TIME: _1015 pm_

INVESTIGATOR: _WEISHAUPT_

I.G. CASE#: _1183-15_

SS# or DIN#: _14A5477_

LOCATION: _CLINTON CF_

"I HAVE BEEN AT CLINTON CF SINCE FEBRUARY 2015. ON 7-5-15 I WAS HOUSED IN C-4-40, I WAS LEAVING THE BLOCK TO GO TO EVENING MEAL. I DIDN'T HAVE MY ID CARD SO I WAS SENT BACK TO MY CELL. LATER THAT EVENING 2 OFFICERS CAME TO MY CELL. ONE OFFICER WAS NOLAN AND I DON'T KNOW THE OTHER ONES NAME BUT HE WAS YOUNG. THEY OPENED THE CELL AND NOLAN CAME IN AND GRABBED ME. THE OTHER OFFICER REACHED AROUND AND PUNCHED ME IN THE FACE. NOLAN TOLD HIM NOT TO PUNCH ME IN THE HEAD, ONLY IN THE BODY. THE OFFICER PUSHED ME INTO THE WALL AND THEN BACKED OUT OF THE CELL AND CLOSED IT. I PUT IN FOR MEDICAL THE NEXT DAY BUT IT WAS A WEEKEND SO I TOLD A NURSE MAKING ROUNDS THAT I WAS ASSAULTED. LATER A CO CAME DOWN AND TOLD ME TO LEAVE THINGS ALONE OR IT WOULD GET WORSE. I WAS SEEN BY MEDICAL ON 7-7-15 AND I TOLD THEM I WAS ASSAULTED BY OFFICERS, SHE CALLED A SGT (SGT CROSS) HE TOLD ME TO LEAVE IT ALONE BUT THE NURSE SAID IT HAD TO BE DOCUMENTED. I GOT PHOTOGRAPHED AT MEDICAL AND GOT A TICKET FOR FIGHTING. THE TICKET WAS

The Harriman State Campus, 1220 Washington Avenue, Albany, NY 12226-2050 | (518) 457-8126 | www.doccs.ny.gov

WAS THROWN OUT. MY INJURIES, THE LEFT SIDE OF MY FACE
WAS SWOLLEN, THERE WERE NO MARKS ON MY BACK AND I
WAS DIZZY FROM MY HEAD HITTING THE WALL WHEN I WAS
PUSHED. I FILED A GRIEVANCE.

CONFIDENTIAL

ATTORNEY VIEWING ONLY