UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

MATTIEU BURKS,

                                   Plaintiff,

                -against-

CORRECTION OFFICER CHAD STICKNEY; CORRECTION OFFICER NOLAN; CORRECTION OFFICER SMITH; CORRECTION OFFICER EDWARD L. PEPPER; SERGEANT JOHN MARK. CROSS; CORRECTION OFFICER DAVID J. CHAMBERLAIN; CORRECTION OFFICER JOSHUA R. WOOD; JOHN DOE "E" BLOCK SERGEANT; SUPERINTENDENT STEVEN RACETTE, SUPERINTENDENT MICHAEL KIRKPATRICK, JOHN DOE SUPERVISOR IN CHARGE OF SECURITY #1, JOHN DOE CORRECTION OFFICERS ##1-25,

                                   Defendants.

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS PURSUANT TO RULE 37 AND THE INHERENT POWER OF THE COURT

Docket No. 16cv759 (FJS)(DEP)

ECF CASE

------------------------------------------------------------------------ x

Stoll, Glickman & Bellina, LLP
By: Leo Glickman
475 Atlantic Ave., 3rd Floor
Brooklyn, NY 11217
(718) 852-3710 (phone)
(718) 852-3586 (fax)
lglickman@stollglickman.com

Plaintiff makes this application for sanctions to be assessed against certain defendants pursuant to Fed. R. Civ. P. 37 for failure to appear for depositions and Pursuant to the inherent power of the court for other obstructionist and uncooperative conduct in the course of discovery. The court held a pre-motion conference on October 17 and permitted plaintiff to make the motion.

I. <u>All Defendants Refused to Appear at Depositions Anywhere Other than Clinton Correctional Facility.</u>

*Unnecessary Wasted Time:  1.1 hours X $198 per hour = <u>$217.80</u>*

On May 19, 2017, the undersigned served formal notice of depositions on the defendants by email and mail.  Depositions were noticed a month in advance and noticed for 125 Wolf Road in Albany.  On May 26, 2017, without discussion or negotiation, AAG Buckley sent the undersigned an email stating that the defendants would not appear in Albany, but instead would only appear at Clinton C.F.  She invited me to conduct the deposition at Clinton C.F. or at her office where they could be conducted by video link up.  I called her to ask if this was a serious requirement and if she would reconsider.  The answer was an unequivocal "no."

On May 30, 2017, the undersigned responded by email, explaining that the defendants cannot simply dictate the terms of the depositions and that Albany was chosen as a permissible and convenient location.  The relevant FRCP provision and caselaw was referenced to further explain that they would be required to appear.  Only then did the defendants relent in their untenable, baseless demand.

There was simply no reason for all of the defendants to initially and in the second instance to flat out refuse to appear in Albany other than obstruction.  Clearly, plaintiff was in his legal right to conduct the depositions in Albany and within the custom and routine of such litigation. AAG

Buckley portrayed it twice as something they simply would not comply with.  Plaintiff should not have been required to perform legal research for such a simple and customary discovery task to be completed.

Glickman decl. ¶¶ 5-7 is one of the Notices of Deposition filed sent to AAG Buckley; the email exchange related to this matter between the parties; and relevant timesheet for the work involved in opposing defendants' unreasonable and unsupportable dictate that the depositions occur in Dannemora, NY.

II.     Defendants' Last Minute Changes to the Terms of the Photo Array Shown to Plaintiff

*Unnecessary Wasted Time:*  3.0 hours (Leo Glickman) X $198 = *$594*
                            2.2 hours (Nicholas Mindicino) X $198 = *$435.60*
*Wasted expense:*           Hotel room *$138.03*

Plaintiff had not identified the officers that he alleges assaulted him on July 5, 2015.  He had reviewed a photo array nine months after the incident in the course of the OSI investigation of officers who worked in C block from the 3 pm -11 pm shift.  Plaintiff alleges in his complaints that the assault took place between 10 pm and midnight, which would put two shifts of officers in issue.  At first, AAG Buckley refused to show plaintiff a photo array of the C block officers from the 11pm to 7 am shift, claiming among other things that they were irrelevant.  *See* Glickman Decl. ¶8.   Eventually defendants relented.

The parties discussed the photo array extensively by phone and email.  In both her April 24 and May 10 emails AAG Buckley says that DOCCS will arrange for plaintiff to review the photo arrays with me.  There were no further requirements or terms.

On June 13, the parties finally arranged to conduct the photo array at 9 A.M. on June 15 at Great Meadow C.F. in Comstock, NY.  The undersigned also had an appointment to meet with plaintiff for Thursday afternoon (June 14) in order to explain what we were doing and complete

2

the interrogatories and Requests for Admission that the defendants had served. On the morning of the 13th, the undersigned asked AAG Buckley to alert him of any problem since he "did not want to do a 7 hour round trip" for no reason. The undersigned booked a hotel room for the night of the 14th near the facility.

      Then, at 7:06 pm on June 13, AAG Buckley sent an email to the undersigned explaining new terms under which the review of photographs would take place. *See* Glickman Decl. ¶9. She said it would be transcribed and videotaped. This was the first instance that this was brought up, even though we had discussed it over a two month period. The undersigned explained that he would not agree to those terms and attempted to negotiate terms to all parties' mutual satisfaction. Instead, in a phone conversation on the morning of the 14th, AAG Buckley further clarified that there would be no opportunity for plaintiff and his counsel to review the photographs prior to being on videotape, and that any discussions between plaintiff and counsel with the photographs would be recorded. There was no room for negotiation.

      Defendants also claimed, outrageously, that despite my objections and refusal to participate under the new terms, state officials at her direction would go forward without my presence in interviewing the plaintiff. She confirmed this in an email later in the day, stating "As discussed with you this morning, we are proceeding with plaintiff's photo array viewing at Great Meadow CF at 9 am tomorrow, as previously agreed. A court reporter will be present to transcribe the viewing. The viewing will be videotaped." *See* Glickman decl. ¶10. Plaintiff was left with no choice but to seek a court order to prevent the state from interviewing my client about the incident on videotape. (*See* docket # 55) AAG Buckley was advised on the phone conversation and by email more than an hour prior to filing that plaintiff would be filing an Emergency Motion to prevent the state from going forward with the interview and photo

3

array. Defendants still did not agree to adjourn the photo array to negotiate the terms and plaintiff filed the Order to Show Cause. It was granted by Judge Scullin later that afternoon. (*See* docket # 58.)

Glickman decl. ¶¶ 11-12 includes the time sheets for Leo Glickman and Nicholas Mindicino and the invoice from the Queensbury Hotel.

### III.   AAG BUCKLEY IDENTIFIED "LUKE NOLAN" AS THE "CORRECTION OFFICER NOLAN" IN THE CAPTION MISLEADING PLAINTIFF THROUGHOUT THIS LITGATION

*Wasted Time for Deposition Preparation:  3.1 X $198 = $613.80*
*Wasted Time Deposition:  1.2 hours X $198 = $237.60*
*Wasted Travel Expense:  292 round trip miles X $.0535 = $156.22*
*Wasted Expense Court Reporter: $589.64*

Plaintiff named "Correction Officer Nolan" as a defendant in this case. Specific allegations were made against an officer Nolan in the body of the complaint. The information was based on the knowledge of plaintiff, who did not know this officer's first name.

Correction Officer Nolan was served in person by delivering the Summons and Complaint to his place of business, believed to be Clinton C.F. At the time of service, there were apparently two Nolans working at the facility, Luke Nolan and Kellen Nolan. At the time of the incident, in addition to Luke and Kellen, a third Nolan worked at the facility, Darwin Nolan.

For reasons we do not know nor understand, Darwin Nolan, the officer who did not work at Clinton C.F. when our process server delivered the summons and complaint to Clinton, was identified as the "Nolan" in the Answer by AAG Buckley. *See* docket # 22. The litigation proceeded as if he was the "Officer Nolan" identified in the Complaint.

In June we scheduled his deposition, which went forward on July 28. Darwin Nolan testified, in sum and substance, that he was the wrong Nolan. That his particular job at Clinton put him in very little contact with inmates. AAG Buckley indicated that she knew this

4

information prior to the deposition, and in Darwin Nolan's presence asked us to voluntarily dismiss the case against him since our naming of him caused him so many months of stress. Since we pointed out to her over the next days that we did not name him, but she who named in and included him in this suit, she really should apply to the court.

Besides to intentionally mislead, it is hard to know why defendants chose to name Darwin Nolan in their Answer.[1] Unlike the other two Nolans who still worked there, he did not work at Clinton C.F. at the time of service and thus was in no way "served". However, the undersigned does know based on our discussions that the Darwin Nolan she named in her Answer was certainly not the Nolan named in the Complaint. And rather than rectifying it, she continued to mislead and allowed the undersigned to go forward with a costly deposition that she led the plaintiff into. Having the audacity to suggest in the presence of her client that the undersigned put him through months of stress because of the litigation just highlights the Attorney General's bad faith in this case.

See Glickman decl. ¶¶ 13-14 for the court reporter invoice and the time sheets related to deposition preparation and the deposition itself.

IV.     MISSED DEPOSITIONS

Wasted Time for Deposition Preparation: 9.4 hours X ½ X $198 = $930.60

Wasted Travel Expense: 78 miles (round trip from Hudson, NY to Albany) X $.0530 = $41.73

Wasted Expense for Hotel Room: $160.27

On June 28, the undersigned informed defendants that he would be available to conduct depositions of seven of the defendants during the weeks of July 17 and July 24. On July 12,

---

[1] We further note to the court that plaintiff identified one of the correction officers during the photograph review. The defendants, after at first refusing to disclose the names of the two officers identified by plaintiff, named one of them as "Luke Nelson" in an email to us. Plaintiff's counsel spent hours going through the 1000 pages of documents in this case attempting to figure out who this new person was. When we could not figure it out, we explained to AAG Buckley that we did not believe a "Luke Nelson" worked at Clinton in 2015. She responded that that was the name DOCCS gave her. When she inquired again, she said the person's actual name was "Luke Nolan", not Nelson, and it was just a "typo". Luke Nolan made sense.

5

AAG Buckley wrote back stating that we could do one deposition per day July 18-21 and on the 25th, 27th and 28th. AAG Buckley understood my desire to conduct depositions on successive days so as not to waste travel time and expense, and this proposed schedule worked for me.

On July 13, AAG Buckley emailed with five confirmed depositions. Kirkpatrick, July 19, Racette, July 20, Cross, July 24, Stickney, July 25, and Nolan July 28. Though not nearly as convenient for the undersigned, it still included two instances of successive dates and it was agreed to.

On July 17, AAG Buckley wrote the undersigned again with more changes. Stickney, July 20, Cross, July 24, Kirkpatrick, July 25, Nolan, July 28, and Racette, August 1. Plaintiff had already reserved a room and court reporter for the July 19 deposition, but the court reporting company was kind enough to refund plaintiff's deposit. These dates were not satisfactory at all, as they spread out the deposition dates necessitating multiple trips. Nevertheless, reluctantly in order to keep things moving the undersigned agreed.

About 45 minutes prior to the July 24 deposition of defendant Cross, AAG Buckley texted me to say that Kirkpatrick would not appear on July 25. She claimed he was "sick". This cancellation caused plaintiff to waste money on the deposit for the room for the deposition and a hotel room.[2] Glickman Decl. ¶15-16.

In early August, the Kirkpatrick deposition was re-scheduled by AAG Buckley for September 20. The undersigned agreed to the date, again, to move things along even though it would force another round trip for one deposition. On September 8, AAG Buckley announced that Kirkpatrick had a "scheduling conflict" and could not appear on the 20th and asked for the 22nd. Reluctantly, I rearranged my schedule and agreed. I arrived in the area in my hotel room

---

[2] Of the seven confirmed depositions for the period between July 17 and July 28, four were cancelled by defendants, none were cancelled by plaintiff.

6

the evening of the 21st when I received a call from AAG Buckley that, again, Kirkpatrick would not be appearing. This again cost plaintiff fees for the court reporter, a hotel room and mileage cost.  In addition, the undersigned also spent a total of 9.4 hours preparing for the Kirkpatrick deposition, which would partially be lost because some of the preparation would be lost over time.  Glickman Decl. ¶17-19.  We claim only half the time of deposition preparation for each cancellation.

> V.  Motion to Compel Depositions of Superintendents Racette and Kirkpatrick on October 24 and 25

The court has compelled the appearance of the two superintendents during the pre-motion conference.  We include what we had drafted and sent to defendants before the pre-motion conference as further evidence of the defendants bad faith conduct in this litigation and in response to defendants' counsel's specious and ugly assertions.

On June 28, Plaintiff asked if the depositions of the defendants could be scheduled during the two week period From July 17 to July 28.  By July 11 the undersigned had received no response so we followed up.  On July 12, AAG Buckley confirmed that all defendants would be available July 18-21 and on the 25, 27, and 28, assuming one deposition per day.   As discussed above, plaintiff agreed.

Plaintiff asked to depose Superintendent Racette on July 18. On July 13, ACC Buckley responded that he was "out of town" on July 18 but would be available on July 20. We agreed to that date. On July 14, AAG Buckley wrote again explaining that he was not available on July 20. On July 17, AAG Buckley informed me by email that she and Superintendent Racette were "aiming" for August 1.  There was no conferral, only that should Superintendent Racette's "aim" to be available that date, the undersigned should be ready to come to Albany for a deposition.

7

With the deposition schedule in disarray and the undersigned's August vacation schedule – which was shared with AAG Buckley from early on – arriving soon, on July 25, 2017, plaintiff wrote the court asking for additional time to complete discovery. When it was granted, rather than make yet one more round trip to Albany to complete just one deposition, the undersigned adjourned the Racette deposition scheduled for August 1 so it could be re-scheduled when depositions could be accomplished in succession. AAG Buckley insisted that it go forward and claimed that he literally did not have one day available in all of September because of his sick father. I then asked about early October, and she reiterated the same. She literally would not make him available for one day over a six week period to work with the undersigned and his schedule.[3] Glickman Decl ¶19.

In a continuing effort to work with the schedules of the defendants, the undersigned agreed in this case to depose Superintendent Racette by remote link up, so he did not have to travel. It was then that I learned that despite AAG Buckley's representations that he was simply unavailable because he was solely responsible for his father's health and literally had no time for a deposition, that he could be available by remote link up on October 5 because he was starting a four day per week job in October and he had one weekday available per week.

On September 21, after confirming Superintendent Kirkpatrick's attendance at the next day's deposition (subsequently cancelled), Superintendent Racette nevertheless cancelled October 5

---

[3] It was in the context of this phone conversation, with AAG Buckley claiming because of Racette's "sick father" could never again be available for a deposition other than on August 1, that we asked if no one could cover even for a few hours of one day caring for Racette's sick father. The undersigned asked if there are literally no other family members, friends or hired care workers who can take care of his father for a few hours at a convenient date for him over a six week period. She said "no", which seemed to be and improbable and frankly, unbelievable assertion. I then said in response that I know he has a wife because I saw her on television, so it seems what you are saying is simply not true. I only point this out here because of AAG Buckley's misleading representation to the court of the undersigned's alleged "inappropriate" comment about his wife. AAG Buckley's statement to the court about the conduct of this litigation, like so many others, was hyperbolic at best and a total fabrication at worst. What distinguished this comment to the court was that it was also disgusting. I invite the court to review his email attached at Glickman Decl. ¶19.

and re-scheduled for October 11.  I explained that I could not be available that day, but proposed any date between September 25 and October 4.  Superintendent Racette refused those days.  I then asked for any date from October 25 to October 31, which was also rejected.  It was October 11, a date that was the result of three cancellations, or never.

VI. FRCP 37(d) and the Court's "Inherent Power to Regulate Litigation" Necessitates the Awarding of Costs, including Certain Litigation Expenses and Fees

"Rule 37(d) specifically provides, however, that a party who fails to attend his own deposition is liable for the costs occasioned by his failure to appear."  Griffin v. Donelli, 2008 WL 398452, at 4 (N.D.N.Y. 2008).  In awarding costs, the court in LeGrande v. Adecco, 233 F.R.D. 253, 258 (N.D.N.Y. 2005) stated "LaGrande's failure to appear at his deposition has caused the Defendant to incur costs which are not inconsequential. Furthermore, his actions are an impediment to the Defendant discovering the basis for his claim."  Attorney's fees and expenses are compensable. Kamps v. Fried, Frank, Harris, Shriver & Jacobson L.L.P., 274 F.R.D. 115 (S.D.N.Y. 2011); Dixon v. Albany Count Bd. of Elections, 2010 WL 1171483 (N.D.N.Y. 2010).

Beyond the defendants' failure to appear at depositions, the court has the inherent power to sanction parties "for conduct that is undertaken 'in bad faith, vexatiously, wantonly, or for oppressive reasons," including through the sanction of dismissal. Chambers v. NASCO, Inc., 501 U.S. 32, 45–49, (1991); Link v. Wabash R.R., 370 U.S. 626, 629–631. A court may sanction bad-faith conduct through its inherent authority even when that conduct could also be sanctioned by the Federal Rules or by statute. Chambers, 501 U.S. at 50.

VII. Explanation of Calculated Costs and Fees

Plaintiff's counsel, as the Glickman Declaration asserts, routinely obtain well in excess of the allowable rate under the Prisoner Litigation Reform Act.  However, recognizing that plaintiff's

9

suit is governed by the 42 USC 1997e, we recognize that we our hourly fees are restricted to 150% of the court appointed attorney rate. As the court is aware, the Northern District of New York CJA rate is $132 per hour, and therefore, the PLRA rate $198 per hour. The total of claimed hours is the number of hours multiplied by $198.

As to travel (driving) cost, plaintiff uses the CJA rate supplied on this court's website of $0.535 per mile. We point out that in each, travel distance is calculated from counsel's Northern Manhattan home, and not his Brooklyn office, reducing the mileage. In the case of the deposition in which defendant Kirkpatrick failed to appear, counsel was in Hudson, NY and therefore the travel distance and cost reflects the much shorter distance.

    VIII.    <u>Conclusion</u>

Plaintiff has attempted to cooperate with defendants and their ever changing scheduling needs. We have served one set of discovery demands, had one dispute related to those demands, and successfully resolved it with the court months ago. Yet, defendants have still not produced the documents and continue to move the court to be relieved from the order in a Rule 54(b) motion.

Even if not in technical violation of a rule, the defendants have repeatedly obstructed discovery. For example, to facilitate the showing of photographs to plaintiff, the parties agreed with the court's assistance that plaintiff would be served with Requests for Admission to establish on the record the time plaintiff believes he was assaulted on July 5, 2015. Plaintiff received a convoluted, incomprehensible set of 16 requests for admission, only a small portion of which had anything to do with the July 5 assault. The undersigned suggested that defendants serve a second set pertaining only to the July 5 assault for fast turnaround. Defendants actually did so and we served responses in 12 days

Yet, when we drafted and served concise notices to admit to two defendants to relieve them from having to appear at a deposition, these two defendants conspicuously used every one of the 30 days.  AAG Buckley, as she has to this court, complained about discovery and the number of depositions we were taking.  We attempted to cooperate, and only asked for a prompt response because we needed to schedule expeditiously.  Defendants refused, instead taking the full 30 days to respond. Even when they don't violate the rules or simply fail to appear, such actions are undertaken in bad faith.

We relay this final anecdote to give the court a sense of how the litigation has been conducted out of court.  In court, AAG Buckley makes flamboyant characterizations of plaintiff's conduct in this matter. In the last conference, she claimed to have faced a "deluge" of discovery demands and advanced the mischaracterization (to say nothing of it being a total *non-sequitur*) of my written settlement demand as "pressuring her" to settle. She has communicated such missives in the past but has offered little in the way of substance to substantiate her allegations.  In contrast, we have substantiated any claims related to this litigation with facts.

Based on the declaration and for the foregoing reasons herein, we respectfully request that pursuant to Fed. R. Civ. P. 37(d) and the inherent power of the court, to assess fees and costs against the defendants in an amount of $4115.29 in costs.  In addition, we request costs related to the bringing of this motion, amounting to $2,653.20 for the 13.4 hours spent drafting it.

Finally, we request that the court compel defendant Racette's and Kirkpatrick's attendance at depositions in Albany on October 24 and 25.

DATED:  Brooklyn, NY
        October 17, 2017           STOLL, GLICKMAN & BELLINA, LLP

                            BY: _____/S/_____
                                Leo Glickman
                                Attorney for Plaintiff
                                475 Atlantic Ave. 3rd flr.
                                Brooklyn, NY 11217
                                (718)852-3710
                                lglickman@stollglickman.com